## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DRAW ANOTHER CIRCLE, LLC, *et al.* [1]<br>Post-Confirmation Debtors. | Chapter 11<br><br>Case No. 16-11452 (KJC)<br><br>(Substantively Consolidated) |
| CURTIS R. SMITH, AS LIQUIDATING TRUSTEE OF THE HASTINGS CREDITORS' LIQUIDATING TRUST,<br>Plaintiff,<br>vs.<br><br>NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC. and JOEL WEINSHANKER,<br>Defendants. | Adv. No. 17-51783 (KJC) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT DISCLOSURES AND TESTIMONY OF MARC B. ROSS AND HAROLD A. SCHAEFFER, JR.

Dated: New York, New York
October 21, 2019

GOLDSTEIN & MCCLINTOCK LLLP
Maria Aprile Sawczuk (No. 3320)
501 Silverside Road, Suite 65
Wilmington, DE 19809
 (302) 444-6710

– and –

KELLEY DRYE & WARREN LLP
James S. Carr, Esq.
Joel A. Hankin, Esq. (admitted pro hac vice)
Dana P. Kane, Esq. (admitted pro hac vice)
Maeghan J. McLoughlin (admitted pro hac vice)
101 Park Avenue
New York, NY 10178
(212) 808-7800

*Counsel to Plaintiff, Curtis R. Smith, as Liquidating Trustee of the Hastings Creditors' Liquidating Trust*

---

1 The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809).

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF NATURE AND STAGE OF PROCEEDING ..................................... 1

II.   SUMMARY OF ARGUMENT ........................................................................ 3

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 4

IV.   ARGUMENT ................................................................................................. 5

    A.    Relevant Legal Standards ................................................................... 5

    B.    The Ross Insolvency Rebuttal Report Is Speculative, and Therefore Does Not Meet Standards of Admissibility .................................... 8

        1.    Ross' Adequate Capital Test and the Ability to Pay Debts Test Do Not Meet The Standards for Admissibility ................................. 8

        2.    Ross' Balance Sheet Test Does Not Meet The Standards for Admissibility ...................................................................... 13

            a.    The Renegotiation of Certain Leases Months After the Testing Dates Is Irrelevant and Unreliable ................... 14

            b.    The Assumption of 15 Leases In Bankruptcy in June 2016 Is Irrelevant and Ignores 15 Months of Additional Lease Liability ...................................................................... 16

            c.    The Ross Insolvency Rebuttal Report Speculates About The Ability of Hastings to Renegotiate 43 Different Leases Each Down To An Arbitrary 15 Months of Lease Liability ....... 17

    C.    Mr. Schaeffer Used Unreliable Methodology and Inaccurate Data in Rendering His Opinions on the Objective Test of the Ordinary Course of Business Analysis. ......................................................................... 20

        1.    Mr. Schaeffer Improperly and Arbitrarily Lowers the Low Average DSO to 10 .......................................................................... 21

        2.    Mr. Schaeffer Improperly and Arbitrarily Raises the High Average DSO to 82, then 112, then 172, and finally to 232 ................... 22

    D.    Mr. Schaeffer Has no Support For His Assertion of A Contemporaneous Exchange .................................................................................. 23

V.    CONCLUSION ......................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ...................................................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ...........................................................................6, 7, 8

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997) ...............................................................................7, 12

*Kannankeril v. Terminix Int'l, Inc.*,
   128 F.3d 802 (3d Cir. 1997) ...........................................................6, 7, 17

*In re Murray, Inc.*,
   392 B.R. 288 (B.A.P. 6th Cir. 2008) .....................................................3

*In re Nellson Nutraceutical, Inc.*,
   356 B.R. 364 (Bankr. D. Del. 2006) ......................................................6

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) ...................................................................6, 7

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008) ................................................................6, 7

*In re RML, Inc.*,
   92 F. 3d 139 (3d Cir. 1996) .................................................................12

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ..................................................................6

Pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702"), Plaintiff Curtis R. Smith, as Liquidating Trustee of the Hastings Creditors' Liquidating Trust (the "Plaintiff"), by and through its undersigned counsel, hereby submits this memorandum of law in support of its *Motion To Exclude The Expert Disclosures and Testimony of Marc B. Ross and Harold A. Schaeffer, Jr.*

## I.      STATEMENT OF NATURE AND STAGE OF PROCEEDING

On October 9, 2017, the Trustee filed the Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 548 and 550 and to Disallow Claims Pursuant to 11 U.S.C. § 502 (the "Complaint") against National Entertainment Collectibles Association, Inc. ("NECA"). The Complaint sought to avoid at least $4,189,927.47 in preferential and fraudulent transfers made directly or indirectly by Debtors Hastings Entertainment, Inc. ("Hastings") and SP Images, Inc. ("SPI") to NECA, an insider of the Debtors, within the two years prior to the Debtors commencing bankruptcy. In particular, the Complaint sought to recover, inter alia, the following payments made to NECA:

(a)     $158,603.52 in transfers to NECA from Hastings (the "Hastings 90 Day Transfers") within 90 days of June 13, 2016 (the "Petition Date") as either preferential transfers pursuant to section 547 of the Bankruptcy Code or fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code;

(b)     $1,526,050.67 in transfers to NECA from Hastings (the "Hastings One Year Transfers" and, together with the Hastings 90 Day Transfers, the "Hastings Transfers") from 91 days and one year of the Petition Date as either preferential transfers pursuant to section 547 of the Bankruptcy Code or fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code;

(c)     $375,934.59 in transfers to NECA from SPI (the "SPI One Year Transfers"; together with the Hastings 90 Day Transfers and Hastings One Year Transfers, the "Preference Payments") from 91 days and one year of the Petition Date as either preferential transfers pursuant to section 547 of the Bankruptcy Code or fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code;

(d)   $1,621,500 in transfers either (a) made by SPI to NECA, or (b) made by Hastings through SPI and then to NECA (and possibly then to Joel Weinshanker ("Weinshanker")) (collectively, the "April 2015 Transfer") within two years of the Petition Date as fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

On August 31, 2018, the Trustee filed an amended complaint (the "Amended Complaint") seeking to (i) avoid the above-referenced transfers and (ii) pierce NECA's corporate veil and hold Weinshanker, the sole-owner of NECA, liable for the debts and obligations of NECA referenced in the Amended Complaint.

On September 6, 2019, the Trustee issued an expert report from David Berliner, CPA, CIRA, CTP, of BDO USA LLP, which concluded that:

> Based upon our analysis of Hastings' solvency as of March 31, 2015 (16 days before the April 2015 Transfer), June 30, 2015, and March 31, 2016, BDO determined that (1) the sum of Hastings' property at a fair valuation was less than its debts (on a going concern basis), (2) Hastings had unreasonably small capital for future operations, and (3) Hastings would not be able to meet its current maturing obligations in the ordinary course of business within 12 to 15 months. Therefore, it is our opinion that Hastings was insolvent on March 31, 2015.

NECA and Weinshanker (the "Defendants") retained Marc B. Ross, to rebut Mr. Berliner's report and separately retained Harold A. Schaeffer, Jr., to opine on whether Defendants had defenses as to the Preference Payments pursuant to 11 U.S.C. § 547(b)(c). Mr. Schaeffer issued two reports on September 6, 2019, and Mr. Ross issued his rebuttal report on September 27, 2019.

As set forth below, Mr. Ross' expert disclosures and deposition testimony, and Mr. Schaeffer's expert disclosures do not meet the standard required for admissible expert testimony under Rule 702.

## II.    <u>SUMMARY OF ARGUMENT</u>

The Defendants served reports from Mr. Ross and Mr. Schaeffer and, presumably, intend for both to testify as expert witnesses at trial.[2]  Based upon Mr. Ross' expert report and deposition testimony, and Mr. Schaeffer's expert report, the opinions that each intends to render as an expert do not meet the minimum standards for expert testimony under the Federal Rules of Evidence.

As set forth more fully below, Mr. Ross's expert disclosures and testimony should be excluded as based on unreliable and improper principles and methodology.  Mr. Ross concludes that Hastings was solvent on March 31, 2015 and on June 30, 2015, based on: (i) the hypothetical ability of Hastings to execute on a complex business plan all while maintaining the same access to funding; (ii) the absence of any lease liability at 15 stores as of March 31, 2015 based on these stores being assumed and assigned, terminated or credit bid by the landlord – actions which took place more than 15 months later after the June 13, 2016 Petition Date; and (iii) the hypothetical renegotiation of leases between Hastings and various landlords at 43 stores culminating in an acknowledged <u>arbitrary</u> 15 months of lease liability, notwithstanding that many of these stores had years remaining on their leases.   Mr. Ross offers no support for his methodologies, assumptions or conclusions.

Mr. Schaeffer's expert disclosures should be excluded as based on insufficient data and unreliable and improper principles and methodology:[3]  Mr. Schaeffer issued opinions based on

---

[2]    Defendants did not issue expert witness disclosures pursuant to Federal Rule of Civil Procedure 26(a)(2), made applicable to this proceeding by Rule 7026 of the Federal Rules of Bankruptcy Procedure.

[3]    Using similarly unreliable and improper principles and methodology, Mr. Schaeffer's opinions have already been excluded by the Bankruptcy Appellate Panel for the Sixth Circuit. *See In re Murray, Inc.*, 392 B.R. 288, 301 (B.A.P. 6th Cir. 2008) (Mr. Schaeffer's determination "that he should make an adjustment to the [domestic] industry

(i) the subjective prong of the ordinary course of business defense pursuant to 11 U.S.C. § 547(c)(2)(a); (ii) the objective ordinary course of business defenses pursuant to 11 U.S.C. § 547(c)(2)(b); and (iii) contemporaneous exchange defense pursuant to 11 U.S.C. § 547(c)(1). Mr. Schaeffer's provides <u>no</u> evidence to support his conclusion that one payment is protected by the contemporaneous exchange, and with respect to his objective ordinary course of business analysis, Mr. Schaeffer improperly expands the objective Days Sales Outstanding ("DSO") range, applying inaccurate data to arbitrarily lower the *lower* end of the range, and applying the ever-changing credit terms between Hastings and NECA to arbitrarily raise the *upper* end of the range, leading to his conclusion that as to some payments, an objectively ordinary DSO range is anywhere between 10 and 232 days.  Schaeffer fails to cite any evidence in support of this methodology.[4]

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

On June 13, 2016  (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and on October 9, 2017, the Plaintiff filed his Complaint against Defendant NECA, initiating this adversary proceeding. [Docket Index No. 1 (hereinafter "D.I. __")].  On November 14, 2017, NECA filed its Answer to the Complaint. [D.I. 5].

On August 31, 2018, the Plaintiff filed the Amended Complaint against Defendants NECA and Weinshanker [D.I. 35], and on October 1, 2018, Defendants NECA and Weinshanker filed their Answer to the Amended Complaint. [D.I. 37].

---

data based on international shipping times" was "not grounded on reliable data, but rather [was] based on speculation").

[4]    The Trustee does not, in this motion, move against Mr. Schaeffer's *subjective* analysis conducted pursuant to 11 U.S.C. § 547(c)(2)(a).  Nevertheless, such analysis is materially flawed, as explained in the Amended Expert Report of Joe Cashel, CTP, CIRA, MBA (the "Cashel Report"), issued in rebuttal on September 30, 2019.

On September 6, 2019, Plaintiff served the Expert Report of David Berliner of BDO USA LLP (the "Berliner Insolvency Report") on Defendant. A copy of the Berliner Insolvency Report with exhibits is attached as **Exhibit "1"** to the Declaration of Joel A. Hankin, Esq., submitted herewith (the "Hankin Dec."). On September 28, 2019, Defendants served the Expert Report of Marc Ross of HBM Management Associates, LLC (the "Ross Insolvency Rebuttal Report") on Defendant. A copy of the Ross Insolvency Rebuttal Report with exhibits is attached as **Exhibit "2"** to the Hankin Declaration.

On September 6, 2019, the Defendants served two reports on Plaintiff from Mr. Schaeffer: (i) Expert Analysis and Opinion regarding the Hastings transfers (the "Schaeffer Hastings Report") and (ii) on Expert Analysis and Opinion regarding the SPI transfers (the "Schaeffer SPI Report"). A copy of the Schaeffer Hastings Report, with exhibits, and Schaeffer SPI Report, with exhibits, are attached as **Exhibit "3"** and **Exhibit "4"**, respectively, to the Hankin Declaration. In response, on September 28, 2019, and thereafter amended on September 30, 2019, Plaintiff served the Expert Report of Joe Cashel, CTP, CIRA, MBA, (the "Cashel Report") on Defendant. A copy of the Cashel Report with exhibits is attached as **Exhibit "5"** to the Hankin Declaration.

## IV.   ARGUMENT

### A.   Relevant Legal Standards

Witnesses seeking qualification as experts must meet the standards provided in Rule 702.

Pursuant to Rule 702, the guidelines for admissibility are as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702, as amended in 2000 pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), charges trial courts with the task of acting as gatekeepers "to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *United States v. Schiff,* 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008)). The party proffering expert testimony bears "the burden of demonstrating by a preponderance of the evidence that the testimony is admissible." *In re Nellson Nutraceutical, Inc.,* 356 B.R. 364, 372 (Bankr. D. Del. 2006) (citing *Daubert,* 509 U.S. at 592, n. 10).

The following are the three major requirements for admissibility of evidence under Rule 702: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda,* 520 F.3d at 244 (citing *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir. 1997)). The Third Circuit has "interpreted the second requirement to mean that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *Id.* (quoting *Kannankeril,* 128 F.3d at 806). In order for the processes or techniques to be reliable, the Third Circuit requires "that the testimony be based on the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" *Kannankeril,* 128 F.3d at 806 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir. 1994)).

Rule 702 does not require a court to accept opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert[,] [it] may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, if a court determines that an expert's opinion is based upon inadequate data, methodology, or studies, the expert's testimony must be excluded. *See* Rule 702 Advisory Committee Notes, 2000 Amendment ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it'") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995)). Further, if any step in an expert's analysis is unreliable, the expert's testimony will be rendered inadmissible. *Paoli,* 35 F.3d at 745. "This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id.*

Courts "should consider several factors in evaluating whether a particular methodology is reliable." *Pineda,* 520 F.3d at 247. Such factors may include: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Id.* at 247-248 (citing *Paoli,* 35 F.3d at 742, n. 8). However, the foregoing factors "are neither exhaustive nor applicable in every case." *Id.* at 248 (quoting *Kannankeril,* 128 F.3d at 806-807).

As set forth below, the Ross Insolvency Rebuttal Report, and portions of the Schaeffer Hastings Report and Schaeffer SPI Report, do not meet the standard required for admissible

expert evidence and testimony under Rule 702, and the applicable standard outlined by the Supreme Court in *Daubert*.

### B.  The Ross Insolvency Rebuttal Report Is Speculative, and Therefore Does Not Meet Standards of Admissibility

Mr. Ross attempts to show Hastings' solvency through three tests: (a) the Balance Sheet Test, (b) the Adequate Capital Test, and (c) the Ability to Pay Debts Test.  Ross Insolvency Rebuttal Report at 2.  With respect to the Adequate Capital Test and the Ability to Pay Debts Test, Mr. Ross does nothing more than offer groundless speculation about the Hastings Business plan (*see* § IV.B.1 *infra*), and with respect to the Balance Sheet Test, Mr. Ross offers groundless speculation about the renegotiation of certain lease liabilities (*see* §§ IV.B.2 and IV.B.3, *infra*).

#### 1.  Ross' Adequate Capital Test and the Ability to Pay Debts Test Do Not Meet The Standards for Admissibility

The Ross Insolvency Rebuttal Report's "analysis" of the Adequate Capital Test and the Ability to Pay Debts Test is nothing more than speculation about the effectiveness of an unverified 2016 Hastings business plan and access to funding.  The entirety of Mr. Ross' analysis of these tests is contained at pages 3-4 and 12-13 of the Ross Insolvency Rebuttal Report, which states (Ross Insolvency Rebuttal Report at 4):

> Had the Company been able to continue with development and implementation of its business plan, including remerchandising stores, reducing general and administrative expenses, and completing negotiations for rent concessions, all while maintaining the same access to funding through its revolving line of credit with Bank of America, then it was surely possible that the Company would have reversed its cash flow deficit while continuing to meet its ongoing obligations. Management believed that their revolving line of credit would be renewed at the January 2017 maturity date (approximately 21 months after the subject transfers) and could not have foreseen in March or June 2015, that Bank of America would limit its funding.

No support is provided for this speculation.  Moreover, Mr. Ross admitted at his deposition that he did not perform any analysis of the probabilities about which he was speculating.  In fact, in connection with the above portion of his report, Mr. Ross testified that where he said if the company successfully completed these tasks it was "surely possible that the Company *would* have reversed its cash flow deficit" (Ross Insolvency Rebuttal Report at 4; emphasis added), he should have said "surely possible that the Company *could* have reversed its cash flow deficit."  According to Mr. Ross:

> Q Mr. Ross, back to Page 4 of your report, the line that we were looking at before where you say "Had the company been able to continue with development and implementation of its business plan, including remerchandising stores, reducing general and administrative expenses and completing negotiations for rent concessions, all while maintaining the same access to funding through its revolving line of credit with Bank of America, then it was surely possible that the company would have reversed its cash flow deficit while continuing to meet its ongoing obligations." Do you see that?
>
> A I do.
>
> Q You're not opining, are you, as to whether the company would have reversed its cash flow; is that correct?
>
> A What I -- I will tell you, when I was reviewing my report, "would" should have said "could." But I'm not saying it would have, no.
>
> Q You're just saying that it's possible that it could have?
>
> A Yes.

Deposition of Marc B. Ross, dated October 15, 2019 at 102:8-103:8 (hereinafter "Ross Dep."), attached as **Exhibit "6"** to the Hankin Declaration.  Thus, Mr. Ross' purported opinion is merely that *if* certain hypothetical events have taken place, namely (i) remerchandising stores; (ii) reducing general and administrative expenses; (iii) obtaining rent concessions; and (iv)

maintaining the same access to its credit line, *then* it was *possible* that the company *could* have

reversed its lengthy history of negative cash flow and have been able to meet its liabilities.

But Mr. Ross did nothing to evaluate this speculation.

> Q In connection with your report, did you consider the macroeconomics of Hastings and the industries that Hastings was in?
>
> A No.
>
> Q Did you -- and I take it, therefore, you did not consider the digitalization of media -- books, music, videos?
>
> A Well, we understood that that was a market they wanted to get out of and that that's what they're working towards doing.
>
> Q You understood that the trend towards that is one of the main factors that was damaging their business?
>
> A Yes.
>
> Q But that trend line was not something that you considered in your analysis?
>
> A No. I believe it's unreasonable to say that at March of 2015 they could not – that it's possible for them to have carried out their business plan had they had adequate capital. And adequate capital presumes the bank continued to fund, all right? And that they had adequate credit from their vendors, which they did. And still, 12 months to 15 months -- it was 12 months forward from there, all right? It wasn't that they filed bankruptcy in June of '15. They didn't. Took until June of '16.
>
> Q I don't know what you mean by that. What are you trying to -- what distinction are you drawing?
>
> A That they had adequate capital to continue on and implement their plan. Had the bank not tightened and ratcheted down credit in 2016, they would have been able to continue on with their plan. Our understanding is the bank tightening and ratcheting down credit prevented them from carrying through on a lot of their business plan.
>
> Q You're not opining on whether the bank had the rights to do that?

A No.

Q You're not opining on whether the bank, from its perspective, was even right to do that; correct?

A No.

(Ross Dep. at 99:8-:101:5.)

Moreover, Mr. Ross states that Management "could not have foreseen in March or June 2015, that Bank of America would limit its funding" (Ross Insolvency Rebuttal Report at 4), but ignored that Management had previously disclosed, both publicly and privately, that Bank of America might do precisely that.  In the internal board of director meeting minutes of Hastings, dated March 26, 2014, Management noted that the Chief Financial Officer of Hastings did not expect the Company to return to profitability until *at least* 2019, and that it faced the following concerns:

- The inherent uncertainty of the Company's banking and vendor relationships based on past and projected future poor operating results.

- Liquidity constraints faced by the Company and the possibility of vendors only doing business on a cash basis;

- The lack of meaningful access to capital markets;

(Ross Dep Ex. 4, attached as **Exhibit "7"** to the Hankin Declaration.)  Mr. Ross testified that he had not reviewed this document (Ross Dep. at 87:13-15), and refused to acknowledge that these statements, made by Management only one year prior to the insolvency date and where Management was projecting five more years of losses, directly contradicted his baseless assertion that Management "could not have foreseen in March or June 2015" that Hastings would lose access to the capital markets.  (Ross Dep. at 87:16-92:18.)

Mr. Ross fared no better when confronted with Hastings' 10-K for the year ending January 31, 2014 (Ross Dep. Ex. 3, attached as **Exhibit "8"** to the Hankin Declaration), in which

Hastings publicly disclosed that Bank of America may "reduce availability in the event of adverse changes in our industry or our financial condition…."  Mr. Ross testified merely that such language is "in almost every agreement, every credit agreement with almost every company." (Ross Dep. at 95:10-12).  But Mr. Ross admitted that Bank of America could reduce availability to capital (Ross Dep. at 95:15-17) and did not opine on whether Bank of America had the right to reduce availability to capital or whether such decision by Bank of America was reasonable (Ross Dep. at 100:24-101:5).

Mr. Ross' only response to these public and private statements of Hastings management, was nothing more than the *ipse dixit* of an expert, stating simply that "My understanding is that Bank of America didn't do anything to change the funding, didn't restrict their access to capital, didn't start restricting it until early '16 or late, late 2015, all right?" (Ross Dep. at 91:3-9) and to refer to vague statements about unidentified management "beliefs" that Bank of America would not restrict capital based solely on the fact that Bank of America had not, in the past, reduced availability to capital (Ross Dep. at 101:20-22).  Mr. Ross thus says in response simply that Bank of America did not restrict Hasting's access to capital until Bank of America restricted access to capital.  The *ipse dixit* of an expert is inadmissible.  *General Electric Co. v. Joiner*, 522 U.S. at 137 (1997).

Where a company is relying on "the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint." *In re RML, Inc.*, 92 F. 3d 139, 156  (3d Cir. 1996).  As explained by the Third Circuit:

> Far from "hindsight" or "post-hoc" analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect

the debtor's true financial condition at the time of the alleged transfers.

*Id.*  Here, Defendants and Mr. Ross require *numerous* future events to occur in order to *possibly* have positive cash flow in the future.  The Berliner Insolvency Report examined the macro-economic indicators at the time and explained why such future events would in all likelihood *not* occur.  Mr. Ross failed to rebut this macro-economic analysis at all.

For the foregoing reasons, Mr. Ross' Adequate Capital Test and the Ability to Pay Debts Test do not meet the standard required for admissible expert testimony under Rule 702.

## 2.    Ross' Balance Sheet Test Does Not Meet The Standards for Admissibility

In connection with his Balance Sheet Test, Mr. Ross agreed with the majority of the balance sheet adjustments made by Mr. Berliner[5] and with respect to the lease adjustments admitted that "We agree that to the extent that Hastings stores were failing, and could not be turned around, then there would have to be recognition of the write-down of the "Right of Use" asset provided by the store real estate lease."  (Ross Insolvency Rebuttal Report at 6.)  Ross simply maintains that the adjustments made by BDO were "too aggressive."  The Berliner Insolvency Report describes the lease adjustments made as follows:

> [T]he fair market value of Hastings' right to use the leases for the lease term should be reflected as an asset and the full NPV of the lease payments to be made should be reflected as a liability.
>
> *              *              *
>
> To determine whether any of the leases were impaired, we reviewed the actual 4-wall EBITDA for each of Hastings' leased locations for the period ending March 31, 2015. We found that of the 130 total leases, 58 lease locations had 4-wall EBITDA that was negative or $0 (see Exhibit I).

---

[5]    At his deposition, Mr. Ross attempted to change his position regarding certain inventory adjustments.  (Ross Dep. 32:15-33:15.)  His changed position is not material for purposes of this motion.

\*       \*       \*

> To account for the fact that some of the leases with negative 4-wall
> EBITDA could in theory improve over time, to be conservative,
> our analysis assumes that the 16 leases with 4-wall EBITDA
> between $0 and negative $35,000 during the period of review may
> at some point generate positive 4-wall EBITDA. Therefore, we
> assumed that these 16 leases were not fully impaired. However, for
> the 42 leases with 4-wall EBITDA in excess of negative $35,000,
> the analysis assumes that these leases will generate losses
> throughout the remainder of their lease terms.

(Berliner Insolvency Report at 57-58.)    The Berliner Insolvency Report applies a 25%
impairment to the sixteen (16) leases with a 4-wall EBITDA between $0 and negative $35,000, a
100% impairment to the forty-two (42) leases with EBITDA in excess of $35,000, and 0%
impairment to the remaining seventy-two (72) leases.  (Berliner Insolvency Report at 58-59, Ex.
I).

Mr. Ross sets out three rebuttal arguments to the above, namely that: (i) RCS Real Estate
Advisors ("RCS"), Hastings' lease restructuring consultant, was able to renegotiate certain leases
in late 2015/early 2016; (ii) of the fifty-eight (58) leases impaired by BDO as of March 31, 2015,
fifteen (15) were credit bid as part of the Bankruptcy in June 2016; and (iii) the remaining forty-
three (43) impaired leases would have been able to have been renegotiated down to a maximum
of 15 months of lease liability.  None of these rebuttal arguments meet the minimum standards
for expert testimony under the Federal Rules of Evidence

> a.    **The Renegotiation of Certain Leases Months After the Testing
>        Dates Is Irrelevant and Unreliable**

The Ross Insolvency Rebuttal Report states (Ross Insolvency Rebuttal Report at 11):

> In the fourth quarter of 2015, the Company hired … RCS to
> restructure its lease obligations. … RCS negotiated over $900,000
> of annual lease concessions, which included approximately $3.4
> million over the remaining term of these leases.

First, as admitted by Mr. Ross, RCS was not engaged until well after the testing dates and the concessions were not obtained until late 2015 or early 2016 (Ross Dep. 103:11-25). Thus, at the outset, the consideration of rent concessions obtained months later to an insolvency analysis as of March 31, 2015 is improper.

Second, even if the future results of RCS are accepted as meaningful to the solvency of Hastings as of the testing dates, the $900,000 in savings referenced by Mr. Ross is not supported by his own exhibits. Exhibits V-VIII of the Ross Insolvency Rebuttal Report are Mr. Ross' lease-by-lease analysis.[6] Each of these exhibits reflect that prior to taking RCS reductions into account, Hastings' monthly rent liability was $2,405,835 (column 6), and *after* taking them into account the rent liability was $2,365,259 (column 7), a monthly savings of $40,576, for an annual savings of only $486,912. Moreover, of the 58 stores which are subject to impairment, RCS obtained concessions from only 4 for a total savings of only $19,373 per month ($232,476 annually).[7]

Finally, even if we utilize the RCS discounted rents for these 4 stores, each of the stores would still be losing money, would still subject to the same impairments based on the Berliner Insolvency Report,[8] and would only reduce the $35,468,953 in lease liability as of March 31, 2015 by $631,447. Thus, this criticism is not meritorious, but even if it is, is inconsequential.

---

[6]    The exhibits are inaccurately listed on page iii of the Ross Insolvency Rebuttal Report. For purposes of this memo these exhibits are referred to based on their cover sheet and not based on the exhibit list.

[7]    As reflected in each of Exhibit V through VIII, concessions were obtained from store number 18 in the amount $5,162.90, store number 21 in the amount $369.05, store number 22 in the amount $7,417.50, and store number 49 in the amount $6,422.78.

[8]    Stores 18, 21 and 22 would still have a negative EBITDA of more than $35,000, and store 49 would still have a negative EBITDA of between $0 and $35,000.

**b.     The Assumption of 15 Leases In Bankruptcy in June 2016 Is
Irrelevant and Ignores 15 Months of Additional Lease Liability**

The Ross Insolvency Rebuttal Report identifies 15 leases, of the 58 leases that BDO

identifies as impaired, as being "either assumed and assigned, terminated or credit bid by the

landlord" in the Hastings bankruptcy in June 2016.  According to Mr. Ross, as to those 15, the

fact that they were addressed in the bankruptcy – at unidentified points in time after June 2016 –

indicates that they had "inherent value at the Testing Dates."  (Ross Insolvency Rebuttal Report

at 8).  Again, Mr. Ross uses future actions taken in bankruptcy to make conclusions about

Hastings' solvency 15 months earlier.  In any event, Mr. Ross provides no support for this

statement, and at his deposition, he admitted that he performed no analysis of the leases

supposed inherent value.

> Q You indicated that these 15 were either assumed and assigned,
> terminated or credit bid by the landlord; right?
>
> A Yes.
>
> Q And that suggests that there was inherent value?
>
> A Right.
>
> Q And your position is, notwithstanding that they were
> assumed/assigned at bankruptcy, that that implies that there's
> inherent value as of March 31st, 2015; correct?
>
> A Yes.
>
> Q Did you do any analysis as to what that value was as of 2015?
>
> A No.
>
> Q Did you do any analysis of those 15 leases as to their location or
> the market conditions or the value of the monthly rental?
>
> MR. ARGENTINA: Objection to form. You can answer.
>
> THE WITNESS: No.

(Ross Dep at 56:9-57:6.)  There is no substance to this opinion.  Mr. Ross identifies a fact from the future and then concludes a value in the past, without any analysis and without identifying what the value was in the future, or how or why it changed, or did not change.

Similarly, Mr. Ross admitted that as to these 15 leases, he failed to account for the fact that there was, at least, 15 months of lease liability from March 31, 2015 until the Petition Date.

> Q Isn't it true that for these 15 stores, rent would have had to be paid for those 15 months, from March 31st, 2015, up at least through the bankruptcy, June 13th, 2016?
>
> A Yes.
>
> Q And that -- those 15 months of rent, are those reflected anywhere in your balance sheet test?
>
> A No.
>
> *       *       *
>
> Q But they have -- you agree with me that they would have paid 15 months of rent to get to that point from March 31st, 2015; right?
>
> A I agree with you that they would have paid 15 months of rent.

(Ross Dep at 50:19-54:11.)  Based on Mr. Ross' own exhibits, that is $4.899 million of lease liability that Mr. Ross admits that he did not account for – and provides no reference to "methods and procedures of science", but instead simply relied on his "subjective belief or unsupported speculation."  *Kannankeril,* 128 F.3d at 806.

       **c.**    **The Ross Insolvency Rebuttal Report Speculates About The Ability of Hastings to Renegotiate 43 Different Leases Each Down To An Arbitrary 15 Months of Lease Liability**

Mr. Ross' most brazen use of unsupported speculation is to then reduce the balance of the leases subject to impairment down to a maximum of 15 months.  Mr. Ross, again, provides ***no*** support for this number.  No methodology is identified and no citation to any authority is

provided. Mr. Ross is not an expert in lease renegotiations.[9] Indeed, Mr. Ross freely admits that

the 15 month number was arbitrary.

> Q And my question to you is: Why did you choose 15 as opposed
> to 24?
>
> A Felt that -- because we felt that 12 to 18 months, all right, would
> be reasonable and had to come to a number.
>
> Q Is it based on anything other than having to come to a number?
>
> A No. We had to -- we had to make an assumption.

(Ross Dep. at 63:21-64:5). The only, partial, explanation provided by Mr. Ross is that *his*

*partner* spoke to Spence Mehle, someone identified as an employee of RCS (Ross Dep. 16:10-

22). Notably, Mr. Ross was not on any call with Mr. Mehle, and testified that the only

information from Mr. Mehle that appeared in his report related to the lease concessions

addressed above.[10] (Ross Dep. 17:6-18:3). But even if the hearsay from Mr. Mehle is

admissible for some purpose, it is speculative and unverified by Mr. Ross, who: (i) performed no

analysis to substantiate the 15-month assumption; (ii) conceded that the possibility of rent

concessions would depend on the length remaining on each lease; (ii) and conceded he made no

efforts to analyze the leases or market conditions to determine whether each, or any, of the

landlords at the 43 locations would agree to only 15 months of lease liability. According to Mr.

Ross:

---

[9]   As noted above in n. 3, Defendants did not file an Expert Disclosure Statement pursuant
to Federal Rule of Civil Procedure 26(a)(2), so there is no statement beyond Mr. Ross'
report, but even a cursory review of Mr. Ross' Curriculum Vitae (Exhibit I to the Ross
Insolvency Rebuttal Report) demonstrates that Mr. Ross has no background in leases or
lease renegotiations.

[10]   Mr. Ross was not permitted to fully testify as to the substance of those calls. In response
to the question: "Q What was your understanding of what information Mr. Mehle
imparted to Mr. Malinowski?", counsel for Defendants asserted a privilege objection.
(Ross Dep. 16:23-17:4). Defendants cannot attempt to rely on information from a third
party and then shield themselves behind specious claims of privilege.

Q The assumption -- your assumption of 15 months, did you do any research to verify that that assumption was accurate?

A We spoke -- well, my partner spoke, I'm sure, to Mr. Mehle, and I believe he ran that by Mr. Mehle, all right. If the company wanted to negotiate a lease, negotiated its way out of a lease with 12 to 15 months or 12 to 18 months, rent concession would be reasonable.

Q Did that assume -- strike that. That 12 to 18 months assumes, does it not, a bankruptcy, at the very least the threat of bankruptcy?

A Well, understanding bankruptcy, I believe, there's occasion where people will threaten bankruptcy -- can threaten bankruptcy; and landlords are pretty sophisticated, but it doesn't assume filing a bankruptcy, no.

Q And it's your view that 15 months was a reasonable assumption, whether or not there were 18 months left on the lease or 107 months left on the lease? That doesn't matter to you?

A No, I would agree that, you know, 107 months on a lease might be harder to negotiate, all right? If you want to -- if there's a 15-month lease in there and you'd like to knock it down to 12 or 9, by all means do so. We were trying to be conservative, and we felt that, on average, 15 months was a reasonable period of time.

Q Do you know what the average number of months remaining was on these 40 or 42 leases that we're talking about?

A I guess it was 51.

Q So it's your view that, on average, landlords would take 15 months in exchange for having 51 months outstanding on their lease obligations?

A It's my view that -- no, it's my view that landlords would realize that it makes economic sense for them to do just that when you've got a store that doesn't want to be in there.

Q But you made no efforts to determine what the market conditions were at any of these lease locations to verify that; correct?

      MR. ARGENTINA: Objection; he's already answered that twice, I think.

      THE WITNESS: Answer it again?

A No.

(Ross Dep. at 64:9-66:12).  Mr. Ross' testimony boils down to speculation, from a financial

advisor and former CPA, that landlords are sophisticated and would have renegotiated.

> Q We don't know what they would have done; right? We only
> know what happened in the case of RCS?
>
> A We know what happened in the case of RCS. These landlords
> are sophisticated. I don't believe they want to get into a long,
> protracted fight.
>
> Q I mean, even you indicate that all this is just possible; right? If
> each landlord chooses to pursue a reasonable settlement with the
> tenant, it's likely that it would have been settled. These were all
> possibilities; correct?
>
> A They were possibilities.

(Ross Dep. at 73:9-21).  Mr. Ross' ipse dixit speculation about possibilities does not meet the

standard required for admissible expert testimony under Rule 702.

### C.    Mr. Schaeffer Used Unreliable Methodology and Inaccurate Data in Rendering His Opinions on the Objective Test of the Ordinary Course of Business Analysis.

Mr. Schaeffer's opinions on the objective test of the ordinary course defenses are the

product of unreliable data and methodology. Mr. Schaeffer's opinions on the Defendant's

purported Section 547(c)(2) defenses must be excluded.[11]  Mr. Schaeffer recognizes that the

Days Sales Outstanding ("DSO") metric by which he performs his analysis, would show a low

average DSO of 27 days and a high average DSO of 56 days for the period between 04/01/15 to

03/31/16 and a low average DSO of 19 days and a high average DSO of 56 days for the period

between 04/01/16 to 03/31/17.  (Schaeffer Hastings Report at 5).  These ranges, however, which

---

[11]    The Trustee does not concede that anything was "ordinary" in the relationship between NECA, SPI and Hastings, and that Mr. Schaeffer's subjective approach is valid.  The relationship between the companies and Mr. Weinshanker's unilateral control over them are fact issues for trial.  Mr. Schaeffer's subjective ordinary course defense analysis, while flawed, is at least based on a generally accepted *methodology*.  Mr. Schaeffer's objective test analysis, however, is not.

closely mirror those utilized in the Cashel Report, do not protect the majority of the Preference Payments at issue.  Mr. Schaeffer therefore proceeds through a series of manipulations in order to expand what he considers to be "ordinary" to anywhere between 10 and 232 days.  Mr. Schaeffer does this by improperly manipulating both the low average DSO and the high average DSO, leading to an untested and unreliable methodology.

> **1.    Mr. Schaeffer Improperly and Arbitrarily Lowers the Low Average DSO to 10**

Mr. Schaeffer ignores the objective low average DSO and sets a new "floor" at 10 days. According to Mr. Schaeffer "the typical payment terms extended by vendors who belong to the Other Miscellaneous Nondurable Goods Merchant Wholesalers Industry is 1% 10 days, Net 30 days credit terms which translates into a net payment due date that is 30 days from the invoice date."  (Schaeffer Hastings Report at 5).  Mr. Schaeffer cites nothing to substantiate these "typical" payment terms[12] and provides no basis for why, even if this is a "typical" payment term, he believes that 10 days should be the new low DSO.  Mr. Schaeffer simply concludes that the "actual low payment floor for data points (individual invoices paid during the preference period) within industry standards would be the discount terms (10 days)  (Schaeffer Hastings Report at 6), effectively concluding that because one company in the industry *may* have paid a discounted rate in 10 days, that should be the floor of what should be considered ordinary.  There is nothing to support this conclusion.

Moreover, NECA did not provide these terms.  As noted by Mr. Cashel, "NECA's typical credit terms, pre-acquisition, with its customers were Net 30."  (Cashel Report at 5).  Mr. Cashel then notes that, after reviewing the actual invoices, post-acquisition credit terms with Hastings

---

[12]     A 1%/10 net 30 deal is when a 1% discount is offered for services or products as long as they are paid within 10 days of a 30-day payment agreement. https://www.investopedia.com/terms/1/1-10net30.asp

were variously Net 30, Net 60 or Net 120, but no invoice contained terms of Net 180 or 1%/10 net 30 (Cashel Report at 5 and n. 9).

Mr. Schaeffer's improper manipulation of the low average DSO to 10 days is based on an unreliable, and unsupported, methodology, and his analysis, therefore does not meet the standard required for admissible expert testimony under Rule 702.

> **2.      Mr. Schaeffer Improperly and Arbitrarily Raises the High Average DSO to 82, then 112, then 172, and finally to 232**

According to Mr. Schaeffer's review of the Hastings Preference Payments, "During the one year preference period there were 211 invoices paid and the actual payment range for receipt of payments for the invoices varied from 6 to 301 days."  (Schaeffer Hastings Report at 3).  Mr. Schaeffer therefore undertook a second improper manipulation of the high average DSO, notwithstanding that his own review of the industry reflected a high average DSO of 56 days.

First Mr. Schaeffer assumes, without support or citation, that the credit terms that relate to the 56 day high average DSO are Net 30.  Based on that unverified assumption, he then proceeds to add 26 days (the difference between 56, the high average DSO, and the assumed net 30 terms) to the high average DSO of 56, to conclude that the "actual high payment ceiling" is 82 (56 plus 26).  As with the "low floor," Mr. Schaeffer is doing nothing but assuming that a single company *may* have paid in 82 days with Net 30 terms.  But Mr. Schaeffer identifies no basis for this adjustment and no methodology or rationale. Mr. Schaeffer has done no analysis of the underlying data to know whether most companies are paying on the 56th day or whether nobody pays on the 56th day.  There is no data to support any analysis.  The data Mr. Schaeffer relies on refutes his manipulations, as he freely admits: "As stated by RMA, this range of average days to be paid equates to the middle quartiles (50%) of all average days to be paid data compiled for this industry. Average data that is outside of this range is considered 'unusual'

values." (Schaeffer Hastings Report at 5). According to the objective data used by Mr. Schaeffer, anything outside of the low average DSO of 27 (or 19) and high average DSO of 56 is "unusual."

When terms are increased to Net 60, Mr. Schaeffer simply adds another 30 days to the high average DSO, raising his high average DSO to 112 (82 plus 30). At Net 120 he concludes that the high average DSO is 172 (82 plus 90), and at Net 180 according to Mr. Schaeffer the high average DSO is 232 (82 plus 150). Mr. Schaeffer offers no justification for these adjustments – nor could he. If Mr. Schaeffer wanted to perform different analyses based on credit terms, he should have obtained industry data based on credit terms. Instead, he took one average DSO range, assumed, without citation to any industry data, that it represented Net 30 day terms, and then proceeded to assume that the same 56 day high average DSO would apply irrespective of terms and simply add days to speculate about a hypothetical "ceiling" of when one hypothetical company might have paid. What Mr. Schaeffer is left with is an entirely a fictitious "actual high payment ceiling" which is not based on the original RMA data. Moreover, he does all this manipulation to get to his "actual high payment ceiling" based on hypothetical lengthy net terms, without simultaneously adjusting his hypothetical "actual low payment floor".

Mr. Schaeffer's improper manipulation of the objective DSO data is based on an unreliable, and unsupported, methodology, and his purported analysis does not meet the standard required for admissible expert testimony under Rule 702.[13]

### D.      Mr. Schaeffer Has no Support For His Assertion of A Contemporaneous Exchange

Mr. Schaeffer states, in full:

---

[13]      Mr. Schaeffer makes the same assumptions, on both high and low DSO ranges, related to SPI (Schaeffer SPI Report at 4-5), notwithstanding that there are no invoices, or terms, between SPI and NECA. Mr. Schaeffer's methodology is equally flawed as to SPI.

> One invoice (invoice # 20150806 dated 08/07/15 for $91,360.29) was paid in six (6) days (paid 08/13/15) which was a contemporaneous exchange transaction (see Exhibit #3).

(Schaeffer Hastings Report at 4).  And:

> Three transfer code payments (Code # O/A:SECFiling dated 06/17/15 for $325.00, Code # O/A:BankFee dated 09/01/15 for $1,439.94 and Code # BoelterACH:07/21/2015 dated 07/21/15 for $145,116.40) were paid in zero (0) to seven (7) days (paid 06/17/15, 09/01/15 and 07/28/15 respectively) which were contemporaneous exchange transactions (see Exhibit #3).

(Schaeffer SPI Report at 4).

Mr. Schaeffer provides no support for his assertion that these were contemporaneous exchanges and protected by 11 U.S.C. § 547(c)(1).  As noted by Mr. Cashel, "the debit memo that Schaeffer uses in his analysis to calculate six days, has credit terms of Net 14, providing further evidence that the transaction(s) was not intended by the parties to be contemporaneous." (Cashel Report at 9).

## V.    <u>CONCLUSION</u>

For all of the reasons set forth above, the Defendant cannot meet Rule 702's standards for admissibility of the Ross Insolvency Rebuttal Report, and portions of the Schaeffer Hastings Report and Schaeffer SPI Report, and thus, the Plaintiff respectfully requests that the Court exclude the expert witness disclosures and testimony of Marc Ross, and the objective analysis contained in the reports and related testimony of Harold A. Schaeffer, Jr., and grant such other and further relief the Court deems just and proper.

Dated: Wilmington, Delaware
October 21, 2019

GOLDSTEIN & MCCLINTOCK LLLP

By:  _/s/ Maria Aprile Sawczuk_
Maria Aprile Sawczuk (No. 3320)
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
E-mail: marias@restructuringshop.com

– and –

KELLEY DRYE & WARREN LLP
James S. Carr, Esq.
Joel A. Hankin, Esq. (admitted _pro hac vice_)
Dana P. Kane, Esq. (admitted _pro hac vice_)
Maeghan J. McLoughlin (admitted _pro hac vice_)
101 Park Avenue
New York, NY 10178
(212) 808-7800
(212) 808-7897 (fax)

_Counsel to Plaintiff, Curtis R. Smith, as Liquidating_
_Trustee of the Hastings Creditors' Liquidating Trust_